Mr. Kent, did you forget to pack socks or is that a California thing? All right, we'll hear from Mr. Hanson. Good morning, Your Honors. May it please the Court, Adam Hanson on behalf of Appellant Armour Robinson. With me today is Mr. Douglas Wellmaker, Ms. Robinson's trial counsel. This case presents the question of how the Fair Labor Standards Act allocates the burden of proving unpaid time. Fortunately, this Court does not write on a clean slate in answering this question. The Supreme Court over 70 years ago, in the Anderson-Mount Clemens decision, resolved this question. And the Supreme Court reaffirmed that decision just last term in the Tyson v. Buofacchio case that we referred to in our reply brief. Under the Mount Clemens burden-shifting regime, the plaintiff has two ways to prove uncompensated overtime. The first way is simple but rare. If the employer has kept accurate time records of all hours worked, the employee can simply access those records in discovery and then use those records as the basis for proving the extent of uncompensated overtime. In the bulk of cases, however, accurate records don't exist, and this is what the Supreme Court described as a difficult problem. This is, I mean, how can you say that accurate records don't exist when they had little plastic cards and they had to check in and check out and there were explicit instructions about how they should check in and check out? Well, the accurate records in this case, Your Honor, don't exist due to the nature of the off-the-clock work in this case. The off-the-clock work happened in two ways. The first is during the lunch breaks, and the second is at the end of the shift. Well, and what evidence do we have of that besides the plaintiff's testimony? The evidence that we have is the plaintiff's testimony, and then it's also corroborated by two witnesses who testified consistently with the plaintiff. So the plaintiff's testimony, just in brief, the employer in this case used what's called a missed punch card, which is a little bit of a misnomer because, as you alluded to, they used these cards. But essentially, in many occasions when the plaintiff would work through her lunch, her supervisors would come to her subsequent to that in the following days and say, here's a piece of paper, fill this out, tell the timekeeper that you forgot to punch in and out for lunch, and that will create essentially a false record that a lunch break was taken when none was taken. So in this case, we don't have some generalized allegation, I worked overtime, or even some slightly less generalized allegation of I worked through lunch. These are very specific conversations in a very specific manner. And did her specific supervisors testify that they told her, or is she referring to other supervisors in regard to other employees? There's no testimony in the record from the supervisors. Of Ms. Robinson? Ms. Robinson's testimony is in the record, and two other coworkers' testimony is in the record. There's no testimony from the supervisors. Okay. But there is. So Ms. Robinson's cousin, who was the head of HR, had no knowledge, testified that she had no knowledge that her cousin worked off the clock. That's right. And that's not disputed, but Ms. Robinson's cousin was really at the end of the line of all of this. She couldn't pick up the phone and call her cousin and say, I'm being overworked and underpaid, honey? That wasn't her job. Ms. Robinson's cousin's job was simply to process the payroll. It was Ms. Robinson's direct supervisors that were going to Ms. Robinson with a piece of paper and saying, fill out this form, make the record reflect that you didn't take a lunch break, I beg your pardon, make the record reflect that you did take a lunch break when, in fact, you did not. Ms. the comptroller, essentially, of the payroll, which was Ms. Robinson's cousin, her job was simply to just process the papers as they came in. The facts in this case certainly conform to the majority of cases that occur under the Mount Clemens framework. And the Supreme Court described this in the Tyson case last term as important because without the Mount Clemens framework, the case last term was Tyson versus Bua Fakio. Well, Tyson was just about what criteria to use to estimate the donning and doffing, right? Tyson addressed a second issue dealing with what I would term as statistical proof. That's certainly not an issue here. Without that, there would really be no difference between Tyson and Mount Clemens itself. So Tyson reaffirmed Mount Clemens and then went on to address the issue of statistical proof. Well, no, that's not accurate because there was no question that people had to don and doff. But here, the company's position is that they had exquisitely technical ways to say the employees had to punch in when they arrived, punch in for lunch, punch out after lunch, and punch in at the end of the day, right? I don't think there's a distinction, Your Honor. In Tyson, the company paid each employee four minutes, and that company's position was that covered all the overtime. So there's really no difference between that case and this case. Well, except for the documentation in this case is that this lady got $18,000 in overtime during four years, did she not? She did, and some of the workers in Tyson also earned overtime. There's no real inference to be drawn there. Certainly, if the defendant wants to argue to the jury, isn't it strange that she earned some overtime and now she's claiming more overtime? Perhaps that creates some sort of a weak inference. The difference between Tyson and this case is that Tyson knew it was doing an estimation, and the employee's position is, well, it could have been more precise. And how do you make it more precise? You can do it statistically, is the court's answer. But in this case, they were trying to be precise. And if Ms. Robinson was claiming that she was doing even more overtime than she was getting paid for, she could have talked to somebody about that. She didn't get fired until she falsified a patient record, right? So she wasn't retaliated against for reporting extra overtime. When your direct supervisor is coming to you and saying, you have to fill out this form to reflect a lunch break when none was taken, or when your direct supervisor is coming to you and saying, you need to clock out even though you have to complete tasks X, Y, and Z at the end of your shift, it would seem somewhat futile to raise a formal complaint. But how can you possibly say that I was systematically doing that, that I was systematically being cheated this way when the company was voluntarily paying you for a considerable amount of overtime otherwise? I think there's just a flawed inference in that argument. It's essentially saying, you know, okay, if the company pays some overtime, they're okay with paying all overtime or as much overtime as worked. Frankly, this fact pattern is common. There are lots of overtime cases where the company pays some overtime, but they don't like paying a lot of it. And certainly to the extent the company can minimize overtime, that saves them money, and that's exactly what happened here. I want to address your previous point. You know, I would concede that Tyson and Mount Clemens are Donning and Dolphin cases, so there is a different factual setting there. But many, many circuit cases, including circuit cases from the Fifth Circuit, apply Mount Clemens in this precise factual scenario where it's a pure off-the-clock case. Brennan v. General Motors is one. Donovan v. Hams is another. These are both cases that are cited in our brief. What about Newton v. City of Henderson? Newton v. City of Henderson. I don't believe that. 1995, Judge Riedley, a policeman who said he was doing undercover work off the clock.  But the employer did not have reason to know that this was being done because the employee never told him. Well, that goes to the employment status, correct? And I'm spitballing a little bit because I don't have the case in front of me, but based on that description. The other side cited it. That's right. Well, I do want to address the knowledge component at the end of the argument. But here are you saying the supervisors were aware of it and actually encouraged and told her to do it? I am saying that, right. And let me just address this point since it's been raised now, and I'll try to address it quickly. With respect to the knowledge, okay, there's no affirmative requirement in the text of the Fair Labor Standards Act that an employer have knowledge of unpaid time. Well, the Fifth Circuit said that, so that's the law. The Fifth Circuit has said that. But the textual hook is important. The textual hook is that the employee must be employed. And the FLSA defines employ as suffer and permit to work. So it's true. And I don't quarrel with the Fifth Circuit's interpretation. If someone is working in complete anonymity where no one is aware of it, it would not be fair to consider that person employed at that time. But there are numerous Fifth Circuit cases and others. And I would, again, point to the Brennan v. General Motors case, and then also to the Lecomte case that we said in our reply. And, Judge Prado, you're exactly right. When a supervisor is aware, in this case encouraging the off-the-clock work, that is absolutely sufficient to satisfy the so-called knowledge requirement, the employment requirement. I still don't understand how this theory of the case works because it's mainly predicated on lunch breaks, is it not? About two-thirds of the damages are lunch breaks, and about one-third is at the end of the day. Okay. And she said there was a requirement that you had to punch in and punch out of your 30-minute lunch break, right? That's correct. All right. If she did that every day, how could the supervisors come back to her later and tell her to file some kind of paper that she didn't clock in? Well, let me back up a second. The requirement is that you take a lunch break and clock in and clock out for lunch. But there is not a requirement that you clock in and clock out when you fail to take a lunch break. In fact, such a policy would be unlawful. So the way that this company operates is the same as every company operates. If for some reason you do not take a lunch break, whether that's a violation of the company policy or not, the FLSA entitles that employee to compensation. But that's my whole point. If that is the case, maybe the other side can explain. If that's the case, if she was not taking the lunch break and not clocking in and out, then her time card would have showed she started work at 7 and she clocked out at 3.30 or whatever it was with no lunch break, and the company would have paid her overtime. This whole business about the supervisor telling her to file a piece of paper would have not had to occur. Well, it's the piece of paper that is where the rubber meets the road because the supervisor would say, go file this piece of paper even though you did not take a lunch break. In fact, the piece of paper will create a false record. But what I'm saying is the record at that point is that she did not take a lunch break. At that state of play, that's correct. But that record doesn't exist anymore. The only thing that exists now or in the record, capital R record for this appeal, are the final numbers. So we're not able to go back and reconstruct these missed punch forms. But you have the burden of proof. We do have the burden of proof. And your only proof is this plaintiff's testimony, right? No. Well, the proof is the plaintiff's testimony and also the testimony of two other witnesses, Deborah McIntyre and Christy Hurst. And I should say, you know, just to comment on the premise of that question, the testimony of a plaintiff who was there, who worked there, who's testifying from firsthand knowledge, is sufficient or certainly can be sufficient to meet the initial burden under Mount Clemens. I guess it was a summary judgment state. You haven't deposed yet the supervisors that she alleges told her to fudge the records? That's right. That testimony is not in the record. Why not? I can't speak to that. I'll try to address that point on rebuttal. Now, there's something in here that she said at her deposition she didn't know how much she worked overtime. Yes. And let me address. And her affidavit supposedly contradicts that. Let me address the affidavit with the remainder of my principal time here. So this is really the second error we identify with the district court, is the invocation of the so-called sham affidavit rule. The way the order of operations in this case is entirely ordinary. Typically, with the deposition, at least in this kind of employment case, it's as if there is a cross-examination without a direct examination. So the lawyer for the opposing side can simply ask whatever discrete questions he wants. There's no obligation on the plaintiff to comprehensively address all of the relevant issues in the case. It's also totally appropriate to oppose a motion for summary judgment with either an affidavit or a declaration, as the plaintiff did here. The court got it wrong both on the law and the facts with respect to the sham affidavit doctrine. The most cogent and well-written decision on this doctrine is actually a Fifth Circuit decision from 1980 called Kenneth Murray v. Bone. And what this decision lays out is if district courts are going to apply this sham affidavit doctrine and if they're going to do it consistent with the Seventh Amendment, it needs to be really locked in that the person testified black in their deposition and then they testified white. Well, we think we know the law there. So why are these reconcilable statements? Sure. And I see that I've just got a few seconds left. You can answer the question. So let me answer the question and then I'll take it out of the rebuttal. No, just answer the question. So if you look at the court. Don't accuse us of intentionally budging the time here. I would never. No implication whatsoever. So if you look at the questions that the district court found significant from Ms. Robinson's testimony, they're seeking very specific information. So the first question is what are you seeking to recover? And she says the amount of time that she worked off the clock. That's an appropriate answer. As we explained in our brief, you know, this question is most naturally read to seek a dollar amount. But a dollar amount requires a bunch of very discrete calculations to arrive. And there's one key distinction. What did she say? Just tell us what she said in the deposition and what she said in her affidavit. Because I didn't look at those. I certainly understand the point you're trying to make, but the facts speak for themselves. Sure. So just running through it very quickly, she was asked, what are you seeking to recover? And she said the time she worked off the clock. And then she was asked, can you identify the weeks? And she said no. And then she was asked, can you identify the time you're seeking to recover, which is sort of a non sequitur, and she said no. And then she was asked, number four, can you identify the amount of money you're seeking to recover? And she said no. She also testified to all these other things we've been talking about. And then in her affidavit, not trying to filibuster, in her affidavit, she provided an estimate of uncompensated time both for the lunches and for the off-the-clock work at the end of the day. And the lunches, it's 30 minutes per lunch, but that can just be gleaned from the records. And then the time at the end of the day, consistent with her initial disclosure, she estimated 1.25 hours per week. I'll reserve the rest of my time for rebuttal. Thank you. Okay. Thank you. All right. Mr. Brown. May it please the Court, I'm John Brown on behalf of Nexion Health. I will say that we don't normally confront these where the magistrate judge writes a long opinion going one way and then the district judge, you know, goes the other way. Understood. Nexion's clear policy is expressed in its employee handbook is that employees are not to work off the clock. Ms. Robinson admitted that she was aware of that policy and would clock in and out using an electronic time clock. As a result of her punches or swiping on the time clock, she received overtime pay on nearly every paycheck, which as the Court noted over the relevant period was more than $18,000. But after being fired for falsifying patient record, she filed suit claiming she was entitled to even more overtime. Judge Lindsey, after reviewing the record, properly granted summary judgment in favor of Nexion. In an overtime case like this, the employee must first prove that she worked the unpaid overtime and prove the amount of the unpaid overtime. And where the employer maintains proper pay records, the employee must prove the amount of the overtime with definite and certain evidence. That is the lesson from this Court in Reeves. And that's the standard that should apply here because Nexion's timekeeping system is a model timekeeping system. The company had issued to Ms. Robinson an electronic badge unique to her, and she clocked in and out throughout the day to record all of her work. When she arrived at the nursing home, she would clock in. And then before she began a meal break, she would clock out. Then after she had finished the meal break but before resuming work, she'd clock back in and stay on the clock until she was ready to leave, at which time she would clock out. Now, in addition to this electronic timekeeping system, there was a backup procedure to make sure that all of her time was captured. And so if Ms. Robinson left her card at home or forgot to clock in, she could fill out a missed punch report document and submit it to HR, which her cousin ran, and that time could be added. It could be reported so that she could be paid for all hours worked. And she admitted in her deposition that there were times that she didn't have her card and had to fill out the missed punch report. Ms. Robinson doesn't dispute the time records. She doesn't quarrel with any of the clock in or clock out times. And she admits that she was paid every minute that she reported. She also doesn't have any separate documentation. She didn't keep a journal or a log of this alleged unpaid overtime. And her claim is based primarily on her deposition testimony. At her deposition, she explained that there were two components. She was looking for additional pay related to some meal breaks, and she was also seeking some time for off-the-clock work at the end of her shift. Now, at her deposition, she initially testified that she didn't receive any meal breaks. But then, as the questions continued, her story dissolved because she provided great detail about the meal breaks. She explained that she understood that while on a meal break she wasn't to work. She explained that the nurses did not have a scheduled meal break. The meal break was determined by the flow of work. There were three stations, one LVN at each station. And so they took turns. The nurses coordinated when they would take a meal break because she wanted to make sure, Ms. Robinson wanted to make sure that her station was covered when she was gone for a meal break. She even testified about where she took the meal break. She said that she typically would go to the break room at the nursing home or she would be at her desk. And then I think this is most significant. She said she never took her food to the nursing home. She ate bought food, meaning that she testified she would either leave the nursing home, drive somewhere, and purchase food and bring it back, or she would have someone else, when she didn't have transportation, purchase food from somewhere else and bring it to her. So from Ms. Robinson's deposition, it is clear that she received meal breaks. But I think she's saying that there were some occasions, or I don't know how many because she wasn't sure, where that didn't occur because her supervisors told her, you know, check out like you're going to lunch, but you've got work to do and check back in. So, yeah, there were a lot of times when she did take lunch, but she's claiming that there were times when she was told, check in and check out as you're going to lunch, but continue working because we've got a lot of work to do. Well, that's interesting because that's not in the record, that she was told clock out to make it look like you're on meal break. That's not in the record? No. What is it in her affidavit? The closest her declaration, let's see, in her declaration, which is not consistent with her deposition, she said that she was told to take a 30-minute hour regardless of whether she took one. But her deposition testimony is different. In her deposition, she said she was told to take lunch breaks, which is consistent with what was in the handbook. She was expected to not work through a meal break without prior authorization. Now, besides the fact that she testified. What about the false little slips that said, oops, I forgot to check in and check out, but here's my slip that says I did or something? That's a great question. What's interesting, if you look in the record, attached to her deposition are the 2012 mispunch documents. And there's one in there that's fascinating because she explains that she didn't take a meal break because of the coverage. So she was simply reporting, as had been requested of her, to explain why she hadn't taken a meal break. That was the whole point of the document. But there's another thing about the record. When you look at the time and pay records for Ms. Robinson, they make very clear that there were lots of days that she didn't clock out for a meal break. It happened all the time. That's what she got paid for. And she got paid every time. More than 150 shifts of at least five hours where she never clocked out for a meal break and was paid every minute of that. Was that within the three-year period? Yes, that's correct. So then we have to look at the off-the-shift or the off-the-clock time at the end of her shift. And she testified at her deposition that it happened, quote, frequently. And when asked what days that occurred, she said she didn't know. When asked what weeks it occurred, she said she didn't know. When asked how much time she was seeking to recover, she said she didn't know. And she couldn't put a dollar value on her claim. And it's these types of unsubstantiated assertions that this court has held are insufficient to survive summary judgment. In Harville v. Westward Communications, more recently in Ike Ward v. Harris County Hospital District, a case that's very similar and involves a nurse at a hospital in Houston. Now, her deposition testimony doesn't meet the definite and certain evidence standard. And after her deposition, when Nexion moved for summary judgment, she signed this declaration under penalty of perjury. And although she had testified that she didn't know the amount of time she was seeking, when she signed this declaration, she gave very specific times. She said with regard to lunch that she was seeking 30 minutes, quote, on those days I was forced to clock out or was forced to fill out a missed punch sheet. With respect to the end-of-shift work, she said it averaged 1.25 hours per week. And Judge Lindsey correctly rejected that declaration as a sham. He pointed out that it didn't supplement or clarify her deposition testimony. It actually contradicted her deposition testimony because you can't have a plaintiff testify under oath, I don't know the time values, and then when confronted with summary judgment testify through a declaration as to figures such as 1.25 hours per week. But even if the declaration was not rejected as a sham, even if it was considered, what is contained in her declaration is insufficient to meet her burden. Because if we look just at the lunches, she says we know that her deposition, she did take meal breaks because she described how she would get in her car and go get food. And we know from the records that there are 150-plus shifts where she worked through her shift without taking a break. So how do we identify these days where she claims 30 minutes? Well, we can't because her quote is, on those days I was forced to clock out or was forced to fill out a missed punch sheet. That's meaningless. That's saying I know 30 minutes for the days that I worked through my break. That's a conclusion. That's not proper summary judgment evidence. Now, with respect to the end-of-shift work, again, she estimated it's 1.25 hours a week. But the records show that she consistently worked past the end of her shift almost every day. When you look at the relevant time period, she averaged clocking out 41 minutes past the end of her shift. So the time in pay records demonstrate that she recorded and received compensation for more time than she put forth in this declaration. But we can go one step further because even if we were to assume that she met her burden of proving she had performed unpaid overtime and had set forth sufficient evidence of the amount of time, she still has to prove knowledge. It is well settled that in the Fifth Circuit the plaintiff must prove the employer had actual or constructive knowledge of the unpaid overtime. That comes straight from the Newton decision from more than 20 years ago. And this court has repeatedly held that an employer has the right to require an employee to follow reasonable timekeeping procedures, and the employee also can't ignore those procedures and then claim that they were improperly paid. Most recently in Fairchild v. All-American, this court reiterated that language from Newton, holding that an employee cannot prevail on an FLSA overtime claim if that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime claim. But that's exactly what Ms. Robinson did. She admitted that she wasn't watched during the day. She admitted that the company relied on her to report all of her time. And this clearly is not a case where she has presented credible evidence that Nexion discouraged her from reporting all time. It's to the contrary. We know what the written policy is. It said don't work off the clock. We also know that she repeatedly worked past the end of her shift, that she worked through meal breaks, and when she reported all that time, she was paid. What is undisputed is that the only thing Ms. Robinson had to do to receive pay for all of her work was report it. That is the lesson that she had learned during her employment. How long was her lunch break? It typically was 30 minutes is what she described, but there was not a schedule. This was at a nursing home? That's right, in Terrell, Texas. But beyond not following the company's reasonable timekeeping procedure, she also took no other steps to report the time. She admitted at her deposition that she didn't report the time. She didn't talk to her cousin who ran HR. She didn't talk to the nursing home director about any of this, even though she knew who he was and saw him on a fairly regular basis. She also testified that she was aware of the company hotline, but she also didn't take advantage of that. What Ms. Robinson offers is only her subjective belief that Nexion knew or should have known about some unpaid overtime. As this court recently noted in Fairchild v. All-American, that's insufficient. A subjective belief is not evidence of the employer's knowledge or constructive knowledge. So for all of these reasons, we contend that Ms. Robinson has failed to establish a genuine issue of material fact, and we request that the court affirm summary judgment in favor of Nexion. Okay, thank you. Mr. Hanton? I'd like to address two discrete points, and that's going to answer any questions the court has. The first point is really just the portions of the record. I'd like to point the court to addressing the issue of the lunch breaks and specifically the falsification of the time. So first, with respect to the lunch breaks, Robinson testified identically in her declaration and in her deposition that she did not take lunch breaks, and that's at record 788 and 89. That's the deposition testimony. Now, did not take lunch breaks and check out and check in, or just didn't take them and got paid for lunch, period? The testimony is she didn't take the actual physical lunch break. And I'm going to get to the second part in a second here, which goes to creating the record. So that's what was happening on the ground. Now, in terms of creating these false records, she testified again, and this is at her deposition, totally consistent with her declaration, record 793. It's not fair that we have to fill them out because we didn't take a lunch break. That's what she told her supervisor. It's not fair. Record 794. This is Mrs. Robinson's recollection of what the supervisor said to her. You have to fill it out. You have to. It doesn't matter. You have to fill them out because they're on our butt. They're on our butt about y'all not taking lunch breaks, so y'all have to fill out these forms. Are these supervisors identified? Yes. They are identified by name in each exchange. Again, at record 791, we were required to fill these out. I mean, like, quote, you didn't take a lunch break yesterday. You need to fill this out. These are recollections of precise conversations. I'm at a loss as to determine how somebody could be more specific. I mean, there's certainly cases with vague, generalized allegations. This is a person in her deposition doing her best to recite actual conversations with specific supervisors by name. So there are times when she was paid overtime for working through lunch, and there were times where she alleges she was not paid because she artificially said she checked out for lunch when, in fact, she worked. That's right. We have a combination of those, and there's no record to show which times one event occurred and which times the other event occurred? Yes to the first question. It was some of both, but no to the second question. There is a record. Because if we look at the final records, on the occasions where she worked through lunch and did not falsify the mispunch form, that's just going to show no clock in and no clock out. And she got paid. She got paid for those, right. And she addressed those in her testimony as well. What's interesting here is the corroborating witnesses corroborate the pressure of being told to falsify these. But essentially, Ms. Robinson said, I felt that if I didn't falsify these that my job was in danger. And a very powerful piece of testimony came from one of these corroborating witnesses and said, didn't you feel your job was in danger? And she said, yes, but I didn't care. I would rather lose my job than falsify this. And then she sort of said, well, what if, you know, there's a medical record showing I administered medication during my lunch break. Did she name the same supervisor? Yes. The corroborating witnesses were Deb McIntyre and Christy Hurst, and the same supervisors are named by name. Nobody ever said a word to management about that. And when management is giving you your marching orders, that is the word. Very briefly, with respect, the second point I wanted to raise with this declaration, if you break down the declaration into the lunches and to the off-the-clock time at the end of the day, there's no inconsistency as to either. But, frankly, with the lunches, there's not even anything to supplement. Her deposition testimony says, I worked through my lunches. You can go look at the records and determine where there is a false record of a punch in and a punch out. The fact that she estimates 30 minutes a day really doesn't add anything, because all you have to do is go back and look at those records. With respect to the 1.25 hours per day. Go ahead. No, it was discovered. Do you know how many of these slips there were? Can we estimate how many lunches we're talking about? Yes. In fact, it really requires very little estimation. You can do it with precision. You simply look at the records, and where there's a lunch break, she's claiming she worked overtime, or she's claiming she worked off the clock. I beg your pardon. Every single lunch break, she worked off the clock. Every single lunch break that shows up on the records, she worked off the clock. So she never, ever took a lunch break, even if she drove out to someplace to pick something up. She never took a lunch break. That's the testimony. With respect to the off-the-clock work at the end of the day. I see I'm out of time, and I see there's no question pending. So I'd simply ask the Court to reverse and remand for trial. Thank you. I have a question.